**Electronically Filed
Intermediate Court of Appeals
CAAP-14-0001328
12-JAN-2016
10:18 AM**

NO. CAAP-14-0001328

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAIʻI


OHANA HOʻOPAKELE, a Hawaiʻi non-profit corporation;
RALPH PALIKAPU DEDMAN; RONALD S. FUJIYOSHI;
JAMES ALBERTINI; LEULLA NOHEA CRUTCHER;
SAMUEL KALELEIKI, JR; VAN KEOKI KAHUMOKU; and
CEDRIC ALIʻI KAI AH SING, Plaintiffs-Appellants,
v.
DEPARTMENT OF ACCOUNTING AND GENERAL SERVICES and
DEPARTMENT OF PUBLIC SAFETY, STATE OF HAWAIʻI; and
DEAN H. SEKI, in his capacity as Comptroller,
State of Hawaiʻi, Defendants-Appellees


APPEAL FROM THE CIRCUIT COURT OF THE THIRD CIRCUIT
(CIVIL NO. 13-1-0474)

MEMORANDUM OPINION
(By:  Nakamura, C.J., Foley and Fujise, JJ.)

Plaintiffs-Appellants Ohana Hoʻopakele, a Hawaiʻi
Nonprofit Corporation; Ralph Palikapu Dedman; Ronald S.
Fujiyoshi; James Albertini; Leulla Nohea Crutcher; Samuel
Kaleleiki Jr.; Van Keoki Kahumoku; and Cedric Aliʻi Kai Ah Sing
(collectively, **Ohana Hoʻopakele**) appeal from the "Final Judgment
in Favor of State Defendants and Against Plaintiffs" (**Final
Judgment**) entered on November 14, 2014 in the Circuit Court of
the Third Circuit[1] (**circuit court**).

On appeal, Ohana Hoʻopakele contends the circuit court
erred in (1) finding "there was no substantial deviation from the

---

[1]  The Honorable Glenn S. Hara presided.

requirements of law or rules on the part of the State Defendants" and (2) finding that the "content of the Final Environmental Assessment sufficiently addressed requirements of the law and rules, including consultation requirements."

## I. BACKGROUND

In 1946, the State of Hawai'i founded Kūlani Correctional Facility (**Kūlani CF**) as a prison on approximately 7,244 acres in the South Hilo District on the slopes of Mauna Kea. In 2009, Kūlani CF was reduced in size to 280 acres and its 160 inmates were transferred to other Hawai'i and Mainland correctional facilities.

On June 15, 2012, Act 117 was signed into law. 2012 Haw. Sess. Laws Act 117 at 419-20. Act 117 lists the Legislature's findings regarding the high rate of substance abuse amongst the Native Hawaiian population. Id. § 1, at 419.[2] The

---

[2] Section 1 of Act 117 provides, in relevant part:

> SECTION 1. The legislature finds that the most recent information on the use of drugs, alcohol, and tobacco reveals a disturbing rise in the use of these substances among the native Hawaiian population. Many studies conducted both nationally and statewide show native Hawaiians to be at particularly high risk for substance abuse. Among students in the eighth and tenth grades, native Hawaiian children rank highest among all ethnic groups in the use of these substances. The studies also show that substance abuse starts at an early age and, if not addressed will:
>
> (1)    Lead to more serious offenses, which break down family structures spiritually, psychologically, socially, and economically;
>
> (2)    Create many health hazards and problems; and
>
> (3)    Lead to other serious problems, such as poverty, homelessness, and a growing dependence on both legal and illegal drugs, which in turn may lead to child abuse, family abuse, sexual abuse, and other serious, life-threatening crimes.
>
> The legislature finds that a pu'uhonua, or wellness center, based on Hawaiian cultural practices will help the native Hawaiian community and the community at-large. Unquestionably, many high-risk persons need to be cared for in a much more sensitive intervention program that will address solutions that will alleviate their problems. The greatest potential to stem the tide of this horrific

(continued...)

2

Legislature found, "a pu'uhonua, or wellness center, based on Hawaiian cultural practices will help the native Hawaiian community and the community at-large." Id. Further, the Legislature found, "the site formerly used as the [Kūlani CF] in east Hawaii would be an ideal site for such a wellness center."[3]

---

[2](...continued)

situation lies in the creation of a pu'uhonua comprising a culturally-based substance abuse treatment and intervention program that takes a holistic approach based upon cultural identity and strength to get to the core of substance abuse. The cultural practices of pule, ho'oponopono, aloha 'aina, mahi'ai, la'au lapa'au, and aloha will help create a sensitive setting. These cultural practices have been successful in the past, possessing the optimal potential to heal an individual. A culturally-based pu'uhonua will restore and maintain a better atmosphere and relationship between family, friends, community, and society.

The legislature further finds that the site formerly used as the Kulani correctional facility in east Hawaii would be an ideal site for such a wellness center. It is a place of deep spirituality for the Hawaiian people and, pragmatically, it has the infrastructure and historical precedent for use in sustainable living.

. . . .

The purpose of this Act is to:

(1)    Reduce recidivism, prevent crime, and ensure long-term positive change by developing a plan to create a wellness center that reestablishes highly recognized native Hawaiian cultural practices to restore the overall well-being of persons, families, and the native Hawaiian community; and

(2)    Create a pilot program to allow incarcerated persons on the Big Island to work in the community on community projects that benefit the local community and the State.

2012 Haw. Sess. Laws Act 117 at 419-20.

[3] Relatedly, Section 2 of Act 117 provides:

SECTION 2.    The department of public safety, in cooperation with Ohana Ho'opakele and other restorative justice groups, is directed to prepare a plan for the creation of a pu'uhonua, or wellness center, on lands owned or controlled by the State. The public land development corporation shall assist in determining an appropriate site for the center; provided that the site formerly used as the Kulani correctional facility on the island of Hawaii shall be given preference, unless another site will provide a greater possibility of success.

(continued...)

Id.

On November 8, 2012, Defendants-Appellees the Department of Accounting and General Services (**DAGS**) and Department of Public Safety for the State of Hawaiʻi (**DPS**) (together, **State**) sent a Draft Environmental Assessment (**Draft EA**) to the Office of Environmental Quality Control in the Department of Health (**OEQC**). The Draft EA summarized the proposed action:

> The [DPS], proposes to reactivate (reopen) developed portions of the 280-acre Kūlani Correctional Facility (Kūlani CF), closed in 2009, to accommodate approximately 200 minimum security inmates. Many inmates assigned to Kūlani CF will be transferred from in-state facilities, allowing for the return to Hawaiʻi of inmates currently serving sentences in Mainland correctional facilities. The project involves primarily logistical actions to assemble required staff and physically transfer Hawaiʻi inmates. Architectural, engineering and environmental analyses in 2012 of the existing dormitories, workshops, dining facilities, and administrative spaces revealed that the facility is ready for occupation by 200 inmates with only nominal repairs and no major facility upgrades. The budget for making necessary repairs and upgrades is $600,000. [DPS] proposes to occupy the site as soon as possible but by 2014 at the latest.
>
> The former Kūlani CF is located on the slopes of Mauna Kea, Island of Hawaiʻi, about 20 miles southwest of Hilo and is accessed through the 19-mile substandard Stainback Highway. The proposed reactivation of Kūlani CF is consistent with numerous established polices. The proposed reactivation supports Hawaiʻi's justice reinvestment initiative strategy to bring out-of-state prisoners back to Hawaiʻi, reduce spending on corrections, and reinvest savings generated in strategies that would reverse recent crime trends.

The proposed action was included in the November 23, 2012 issue of The Environmental Notice.

On June 12, 2013, the State submitted its Final Environmental Assessment (**Final EA**) to the OEQC with its Finding

---

[3](...continued)

> The department of public safety shall submit a report to the legislature on its plan, findings, and recommendations, including the factors used in determining site selection, and any budget requests necessary to achieve the purposes of this Act, no later than twenty days prior to the convening of the regular session of 2013.

2012 Haw. Sess. Laws Act 117, § 2 at 420.

of No Significant Impact (**FONSI**) for publication in The Environmental Notice.

On August 2, 2013, Ohana Hoʻopakele filed a "Complaint for Declaratory and Injunctive Relief" (**Complaint**), challenging the sufficiency of the Draft EA and Final EA. Ohana Hoʻopakele filed a "Stipulation to Amend First Amended Complaint Filed Decemeber 24, 2013" (**Second Amended Complaint**) on February 10, 2014.

On June 2, 2014, Ohana Hoʻopakele filed a "Motion for Summary Judgment on [its Second Amended Complaint]" (**Ohana MSJ**). On June 12, 2014, the State filed its "Memorandum in Opposition to [the Ohana MSJ]. The hearing on the Ohana MSJ took place on June 20, 2014, at which time the circuit court denied the Ohana MSJ.

On June 30, 2014, the State filed its own "[State's] Motion for Summary Judgment (**State MSJ**), to which Ohana Hoʻopakele did not submit an opposition memorandum. A hearing on the State MSJ took place on July 23, 2014. In the order entered on September 25, 2014, the circuit court granted the State MSJ and concluded:

> Pursuant to the standard set forth in [Hawaiʻi Rules of Civil Procedure (**HRCP**) Rule 56(c)], this Court finds that there are no genuine issues as to any material fact, and the [State is] entitled to judgment as a matter of law. The Court finds that there was no substantial deviation from the requirements of law and rules. Given the overall review of the project, the matter was decided within a practical time as required by the statute; the content of the Final [EA] sufficiently addressed requirements of the law and rules, including but not limited to consultation requirements, and the period for receiving and responding to comments.

The Final Judgment of the circuit court was entered on November 14, 2014. Ohana Hoʻopakele filed its notice of appeal on December 1, 2014.

## II. STANDARD OF REVIEW

**Summary Judgment**

> We review summary judgments de novo. See Kamaka v. Goodsill Anderson Quinn & Stifel, 117 Hawaiʻi 92, 104, 176 P.3d 91, 103 (2008). Under HRCP Rule 56(c), the circuit court must grant a motion for summary judgment when the moving party: (1) has shown that there is no genuine issue regarding any material fact, and (2) is entitled to judgment

5

as a matter of law.  Id.

. . . .

> In cases of public importance, summary judgments
> should be granted sparingly, and never on limited and
> indefinite factual foundations.  Molokai Homesteaders Coop.
> Ass'n v. Cobb, 63 Haw. 453, 458, 629 P.2d 1134, 1139 (1981).
> But where there is no genuine issue as to any material fact
> and [the moving parties] clearly demonstrate they should
> prevail as a matter of law, the disposition of a case by
> summary judgment is proper.  Id.

Kilakila ʻO Haleakala v. Univ. of Hawaiʻi, 134 Hawaiʻi 86, 91, 332
P.3d 688, 693 (App. 2014).

"In order to determine whether [the proponent of an
Environmental Impact Statement (**EIS**)] has demonstrated that it is
entitled to summary judgment as a matter of law, we use the 'rule
of reason' to determine whether the EIS is legally sufficient in
adequately disclosing facts to enable a decision-making body to
render an informed decision."  Price v. Obayashi Hawaii Corp., 81
Hawaiʻi 171, 182, 914 P.2d 1364, 1375 (1996) (citing Life of the
Land v. Ariyoshi, 59 Haw. 156, 164, 577 P.3d 1116, 1121 (1978)).
Under the rule of reason:

> [A]n EIS need not be exhaustive to the point of discussing
> all possible details bearing on the proposed action but will
> be upheld as adequate if it has been compiled in good faith
> and sets forth sufficient information to enable the
> decision-maker to consider fully the environmental factors
> involved and to make a reasoned decision after balancing the
> risks of harm to the environment against the benefits to be
> derived from the proposed action, as well as to make a
> reasoned choice between alternatives.

Price, 81 Hawaiʻi at 183, 914 P.2d at 1376 (quoting Life of the
Land, 59 Haw. at 164-65, 577 P.2d at 1121).[4]  Although this case

---

[4] The Hawaiʻi Supreme Court noted:

> Furthermore, Hawaii Administrative Rules (**HAR**) §§ 11-
> 200-17 and -18 state the minimum content requirements for a
> draft and a final EIS, respectively.  These sections provide
> a long list of specific topics that must be included within
> the EIS.  It is important to note that neither [Hawaii
> Revised Statutes (**HRS**) chapter] 343 nor the administrative
> rules of [c]hapter 200 indicate the level of detail or
> specificity that should be included on any given subject.
> The statute and rules were designed to give latitude to the
> accepting agency as to the content of each EIS.  Thus, what
> is required in one EIS may not be required in another, based
> upon the circumstances presented by the particular project.
> (continued...)

presents the question of the sufficiency of the State's compliance with regulations regarding an EA rather than an EIS, we recognize the same latitude in the HAR given to the accepting agency over EISs for EAs, and apply the same standard in evaluating EAs.  See Price, 81 Hawaiʻi at 182-83, 914 P.3d at 1375-76.

### III.  DISCUSSION

On appeal, Ohana Hoʻopakele argues the circuit court erred because "[State's] EA is not adequate as a [HRS chapter] 343 evaluation document and fails to acknowledge how the proposed action adversely affects social welfare and cultural practices, among other significant effects."  Specifically, Ohana Hoʻopakele contends:

> [T]he [State] did not meet requirements of HRS [c]hapter 343 and HAR [c]hapter 11-200.  In terms of consulting with members of the public that they should reasonably believe would be affected, the [State] side-stepped requirements of Act 117 and HAR 11-200-9(A)(1) by running parallel courses during preparation of the Draft EA: while disregarding the requirements of Act 117 in the actual environmental review, [DPS] nonetheless purported to be complying with Act 117, such as by meeting with Ohana Hoʻopakele, holding the Puʻuhonua Summit with OHA and briefly answering written puʻuhonua comments in the Final EA.

(Emphasis omitted.)  Ohana Hoʻopakele raises three issues which it contends undermines the State's assessment and evaluation of the proposed action.  Ohana Hoʻopakele argues that the State (1) "disregard[ed] the consultation with Ohana Hoʻopakele that was required by both Act 117 and applicable regulations," (2) did not consider a puʻuhonua as an alternative action to the reactivation of Kulani as a minimum security prison, and (3) "disregard[ed] endangered species."

Ohana Hoʻopakele's challenge is based on HRS § 343-5(a)(1) (2010 Repl.), which provides, in relevant part:

> §343-5 Applicability and requirements.  (a) Except as otherwise provided, an environmental assessment shall be required for actions that:

---

[4](...continued)

Price, 81 Hawaiʻi at 182-83, 914 P.3d at 1375-76.

> (1) Propose the use of state or county lands or the use of state or county funds, other than funds to be used for feasibility or planning studies for possible future programs or projects that the agency has not approved, adopted, or funded, or funds to be used for the acquisition of unimproved real property; provided that the agency shall consider environmental factors and available alternatives in its feasibility or planning studies; provided further that an environmental assessment for proposed uses under section 205-2(d)(11) or 205-4.5(a)(13) shall only be required pursuant to section 205-5(b).

HRS § 343-5(c)(4) (Supp. 2015) requires, "For environmental assessments for which a finding of no significant impact is anticipated . . . [an environmental impact] statement shall be required if the agency finds that the proposed action may have a significant effect on the environment[.]" HAR § 11-200-2 (1996) defines "environmental assessment" as "a written evaluation to determine whether an action may have a significant environmental effect." A "significant effect" or "significant impact" under HAR § 11-200-2 is defined as

> the sum of effects on the quality of the environment, including actions that irrevocably commit a natural resource, curtail the range of beneficial uses of the environment, are contrary to the state's environmental policies or long-term environmental goals and guidelines as established by law, or adversely affect the economic or social welfare, or are otherwise set forth in section 11-200-12 of this chapter.

Every environmental assessment is required to include, at a minimum, certain information:

> § 11-200-10  Contents of an Environmental Assessment.
> . . . .
>
> (1) Identification of applicant or proposing agency;
>
> (2) Identification of approving agency, if applicable;
>
> (3) Identification of agencies, citizen groups, and individuals consulted in making the assessment;
>
> (4) General description of the action's technical, economic, social, and environmental characteristics;
>
> (5) Summary description of the affected environment, including suitable and

8

adequate regional, location and site maps such as Flood Insurance Rate Maps, Floodway Boundary Maps, or United States Geological Survey topographic maps;

(6)     Identification and summary of impacts and alternatives considered;

(7)     Proposed mitigation measures;

(8)     Agency determination or, for draft environmental assessments only, an anticipated determination;

(9)     Findings and reasons supporting the agency determination or anticipated determination;

(10)    Agencies to be consulted in the preparation of the EIS, if an EIS is to be prepared;

(11)    List of all permits and approvals (State, federal, county) required; and

(12)    Written comments and responses to the comments under the early consultation provisions of sections 11-200-9(a)(1), 11-200-9(b)(1), or 11-200-15, and statutorily prescribed public review periods.

HAR §11-200-10 (1996)

## A.   Act 117

The crux of Ohana Ho'opakele's appeal is that Act 117 established standards to which the State was required to comply in reactivating Kūlani CF.  Ohana Ho'opakele argues that Act 117 and applicable regulations required the State to consult with Ohana Ho'opakele and to consider the creation of a pu'uhonua as an alternative to the reactivation of Kūlani CF.

### 1.   Consultation with Ohana Ho'opakele

Ohana Ho'opalele argues that the State failed to consult with Ohana Ho'opalele in the State's environmental review.  HAR § 11-200-9(a)(1) (1996) requires an agency preparing an environmental assessment to "consult with other agencies having jurisdiction or expertise as well as those citizen groups and individuals which the proposing agency reasonably believes to be affected."  HAR § 11-200-10(3) requires that a draft or final environmental assessment include an "[i]dentification of

9

agencies, citizen groups, and individuals consulted in making the assessment[.]" Ohana Hoʻopakele argues that instead of consulting with them as an interested citizen group, "[DPS] just decided to re-open the Kūlani [CF], got the funding to do so, then went through the motions of appearing to comply with environmental review requirements while actually considering only a single purpose as the proposed action." The single purpose, Ohana Hoʻopakele asserts, was to use Kūlani CF as it was used prior to its closure as a prison.

In response, the State asserted:

> Approximately 60 agencies, organizations, and citizens, including [Ohana Hoʻopakele and other individual Plaintiffs], were consulted or availed themselves of the opportunity to comment on the EA. . . . The State considered, and responded in writing to their comments, prior to finalizing the EA. . . . Further, Act 117 was included and considered in the Final EA.

The State elaborated:

> The identification of those who were consulted and all those who submitted comments, including their comments and [DPS's] responses, were incorporated in the Final EA. All comments were considered, responded to in writing, and included as appendices to the Final EA as an entire, complete informational document. . . . Act 117 and [DPS's] report to the legislature on Act 117, including Ohana Hoʻopakele's presentation at the puʻuhonua summit, were also included as appendices to the Final EA.

The State MSJ contended, "The fact that [Ohana Hoʻopakele] do[es] not agree that this list is sufficient does not mean that the State failed to consult with county and other agencies as well as citizen groups and individuals." The State further argued that "[a]ll comments, including those of [Ohana Hoʻopakele and other individual Plaintiffs], were considered in the preparation of the Final EA."

Ohana Hoʻopakele asserts that the State was required to consult with Ohana Hoʻopakele pursuant to Act 117. Act 117, however, does not alter the requirements of HAR chapter 200. See 2012 Haw. Sess. Laws Act 117, at 419-20. Even if Act 117 created a binding requirement for the State to consult with Ohana Hoʻopakele, the State clearly met that requirement. In its 2013 report to the Legislature, titled "Act 117: Wellness Center that

10

Reestablishes Native Hawaiian Cultural Practices," the DPS reported:

> This annual report has been prepared in compliance with [2012 Haw. Sess. Laws Act 117]. . . .
>
> At the request of [DPS's] Interim Director (IDIR) Ted Sakai, the Chief Executive Officer, Dr. Kamana'opono Crabbe, of the Office of Hawaiian Affairs (OHA) and IDIR Sakai met on August 29, 2012 to discuss the pu'uhonua concept. After this meeting, it was decided that OHA, with the support of [DPS], would hold a Pu'uhonua Summit that would allow various kupuna to share their in-depth knowledge of the pu'uhonua concept and to educate [DPS] and other stakeholders (e.g. Judiciary, Department of the Prosecuting Attorney) on the pu'uhonua concept.
>
> On July 13, 2012, <u>IDIR Ted Sakai met with representatives of Ohana Ho'opakele to listen to their ideas on the pu'uhonua concept</u>. The IDIR encouraged Ohana Ho'opakele to present their ideas in writing, including a concept of how a pu'uhonua would work with offenders. On September 19, 2012, IDIR Sakai and a [DPS] staff member met again with various associates of Ohana Ho'opakele to listen to their ideas on the pu'uhonua concept. . . .
>
> <u>OHA and [DPS] invited various kupuna and stakeholders, including Ohana Ho'opakele, to the Pu'uhonua Summit that was held on November 2 and 3, 2012</u>. Invitees included members of the Judiciary, corrections administrators, the Hawaii Paroling Authority, legislators, cultural practitioners, and experts in Hawaiian culture.

(Emphases added.)

The circuit court did not err in concluding that the State was entitled to summary judgment as a matter of law on the issue of whether the State complied with the consultation requirements of HAR chapter 200.

### 2. Alternative Action

Ohana Ho'opakele argues "there was a specific legal requirement for [DPS] to consider as an alternative the use of the site for a pu'uhonua, in consultation with Ohana Ho'opakele."

HAR § 11-200-9(c) requires the proposing agency to "analyze alternatives, in addition to the proposed action in the environmental assessment."[5] Additionally, HAR § 11-200-10

---

[5] The regulations concerning an EIS provides examples of alternatives, including:

    (1)   The alternative of no action;

    (2)   Alternatives requiring actions of a significantly

(continued...)

11

requires a draft or final environmental assessment to contain the "[i]dentification and summary of impacts and alternatives considered."

In its Final EA, the State included two alternatives: (1) the "No-Reactivation Alternative," in which "the inmates would remain in Mainland correctional facilities[,]" and (2) the "Delayed-Project Alternative," in which the "200 minimum security inmates would remain in Mainland correctional facilities" and "[t]he staff would not be hired by or work at the facility in the near future."

Ohana Ho'opakele cites no authority for the proposition that the State is required to consider all alternatives to the proposed action. The standard that applies to the alternative action provisions of the HAR should be the same standard that applies to assessing the legal sufficiency of an EIS--the "rule of reason." See Price, 81 Hawai'i at 182, 914 P.2d at 1375. Under the rule of reason, the State is not required to exhaust all possible alternatives to the proposed action. Id. Instead, an EIS

> will be upheld as adequate if it has been compiled in good faith and sets forth sufficient information to enable the decision-maker to consider fully the environmental factors involved and to make a reasoned decision after balancing the risks of harm to the environment against the benefits to be derived from the proposed action, as well as to make a reasoned choice between alternatives.

Id. (quoting Life of the Land, 59 Haw. at 164-65, 577 P.2d at 1121).

Here, there is no evidence in the record to suggest

---

[5](...continued)
different nature which would provide similar benefits with different environmental impacts;

(3)     Alternatives related to different designs or details of the proposed actions which would present different environmental impacts;

(4)     The alternative of postponing action pending further study; and,

(5)     Alternative locations for the proposed project.

HAR § 11-200-17(f) (1996).

that the State did not compile the EA in good faith. As the State asserts, there is no evidence that a plan for a pu'uhonua had been sufficiently developed or prepared to make a pu'uhonua a viable alternative at the time the EA was prepared, and the reactivation of the Kūlani site as a correctional facility did not prevent the site from being considered for a pu'uhonua in the future. The Final EA stated that the DPS "is working to make the reactivation of [Kūlani CF] consistent with the goals stated in Act 117, including evaluation of [Kūlani CF] as 'the ideal site' for a wellness center vs. other state lands." The Final EA sets forth sufficient information for a decision-maker to consider fully the environmental factors involved and to make a reasoned analysis of alternative actions. The circuit court did not err in concluding that the State was entitled to summary judgment on the issue of its consideration of alternative actions in its Final EA.

## B. Endangered Species

On appeal, Ohana Ho'opakele argues that "the Final EA does not consider the issue of preservation of endangered and threatened plant and animal species . . . ." The State's Final EA[6], Ohana Ho'opakele argues, "essentially

---

[6] The Final EA includes a discussion of the impact of the proposed project on plant and animal species. The Final EA states in relevant part:

> 4.7    Flora and Fauna Resources
>
> The developed portion of Kūlani CF does not provide habitat and . . . does [not] contain any rare, endangered or threatened animal or plant species. However, it has been pointed out by [the Department of Land and Natural Resources (**DLNR**)] as follows:
>
> • [Nēnē ("Hawaiian Goose," Mary Kawena Pukui & Samuel H. Elbert, <u>Hawaiian Dictionary</u> at 264 (1986))], an endangered species, are present in the developed areas of [Kūlani CF] and the area provides feeding, resting and potential nesting habitat. Threats to [Nēnē] at [Kūlani CF] include humans, predators (e.g. dogs, cats, and mongoose) and vehicles. In the past, [Kūlani CF] conflicts with [Nēnē] included staff and inmates feeding [Nēnē], inmates trying to capture [Nēnē] and [Nēnē] attraction to the sewage treatment plant leaching fields and water catchment. Mitigation for [Nēnē] will be needed for reactivation, and the specific details of mitigation should be addressed through consultation with [the Department of Fish and Wildlife (**DOFAW**)] and U.S. Fish and Wildlife Service [(**USFWS**)]. Potential mitigation includes educational efforts for staff and inmates, trapping of predators

(continued...)

[6](...continued)
such as feral dogs and cats, and access for DOFAW staff to manage and monitor birds. The exception, however, is the observed use of [Kūlani CF's] ballfield by the Nēnē Goose (Branta sandwichense) for foraging. It should be noted that the entire facility is open for foraging by the Nēnē.

- DOFAW is planning to release the endangered 'Alala (Corvus hawaiiensis), or Hawaiian Crow, in the adjacent Pu'u Maka'ala Natural Area Reserve (NAR), and mitigation for this species may also be needed. DOFAW staff and partners will need to access [Kūlani CF] 24 hours/day to manage and/or monitor released birds and control predators. The loud sirens previously used at [Kūlani CF] could potentially attract released 'Alala to [Kūlani CF] and alternatives to use of the sirens should be analyzed. Educational efforts for staff and inmates should also be pursued to avoid conflict with any 'Alala that enter the facility grounds.

- Fifteen species of federally listed endangered plants occur in or near Pu'u Maka'ala NAR. Endangered plants such as Phyllostegia velutina, have been found in the intact native forest scattered throughout the developed portions of [Kūlani CF]. [Kūlani CF] does contain habitat for this species and potentially some of the other rare species known from adjacent areas. Botanical surveys for rare plants will need to be done for any work that includes tree/vegetation or ground disturbance or clearing such as cinder mining, agriculture, road widening and/or clearing, maintaining electric lines etc.

- Forested portions of [Kūlani CF] and the adjacent DOFAW lands provide habitat for native forest birds including three endangered species: Hawai'i Creeper (Oreomystis mana), Hawai'i 'Akepa (Loxops coccineus), and 'Akiapola'au (Hemignathus munroi). The status of 'I'iwi (Vestiaria coccinea) is currently being review [sic] to determine if this species should be listed as endangered or threatened. The non-endangered forest birds found in the project area include: 'Apapane (Himatione sanguinea), Hawai'i 'Amakihi (Hemignathus virens), 'Elepaio (Chasiempis sandwichensis), and 'Oma'o or Hawaiian thrush (Myadestes obscurus). Other birds include the endangered Hawaiian hawk or 'Io (Buteo solitarius), Hawaiian owl or Pueo (Asio flammeus sandwichensis) and Pacific golden-plover or Kolea (Pluvialisfulva). DOFAW staff will need access to [Kūlani CF] to manage and/or protect these endangered native birds by maintaining fencing, controlling predators and removing weeds. Additionally, activities such as tree clearing, road maintenance, introduction of predators (e.g. cats) may affect nesting of these species.

- The endangered 'Ua'u or Hawaiian petrel (Pterodroma sandwichensis) and the 'Ake'ake or band-rumped storm petrel (Oceanodroma castro) may overfly [Kūlani CF] going to nesting areas on the upper, eastern slopes of Mauna Loa [(on the island of Hawai'i)]. These birds may be impacted by [Kūlani CF] lighting as well as predators, particularly cats. The EA should clarify

(continued...)

14

disregards comments from individuals, organizations and state and federal agencies regarding potential impacts on federally and state listed endangered flora and fauna at the [Kūlani CF] site."

HAR § 11-200-12 (1996) provides, in relevant part:

§ **11-200-12** Significance criteria. (a) In considering the significance of potential environmental effects, agencies shall consider the sum of effects on the quality of the environment, and shall evaluate the overall and cumulative effects of an action.

(b) In determining whether an action may have a significant effect on the environment, the agency shall consider every phase of a proposed action, the expected consequences, both primary and secondary, and the cumulative as well as the short-term and long-term effects of the action. In most instances, an action shall be determined to have a significant effect on the environment if it:

. . . .

(9)     Substantially affects a rare, threatened, or endangered species or its habitat[.]

Ohana Ho'opakele cites, for example, the letter written

--------------------------------

[6](...continued)
that lighting will follow standards recommended to prevent impacts to migrating seabirds.

•     Hawai'i's only endemic land mammal, the 'ope'ape'a or endangered Hawaiian hoary bat (Lasiurus cinereus semotus), is also present at [Kūlani CF] and in adjacent areas. Bats may be attracted to facility lighting for feeding, and activities such as tree clearing may negatively impact the 'ope'ape'a, particularly during pupping season.

In a June 6, 2002 letter regarding possible impacts of a proposed new wastewater treatment plant at the project site, the [USFWS] stated the following: "...based on information from our files, data compiled by the Hawai'i Biodiversity and Mapping Program, data compiled by the Hawai'i GAP program, and local expert knowledge, the USFWS determined that there are four federally listed species that may occur within or adjacent to areas of Kūlani CF: threatened Newell's Shearwater (Puffinus auricularis newlli) and endangered Hawaiian Petrel (Pterodroma phaepygia sandwichensis) (collectively known as seabirds); endangered Hawaiian stilt (Himantopus mexicanus knudseni); and endangered Nēnē (Bronta sandiwchense). No federally designated critical habitats are present." (DAGS, 2002).

Nēnē are known to frequent the ball field and other developed areas at Kūlani CF and tend to use the area for loafing and feeding during spring and summer flocking seasons. Biologists at Hawai'i Volcanoes National Park have received reports of nēnē on the [Kūlani CF ball field] (DAGS, 2002).

(Emphasis omitted.)

15

by the Three Mountain Alliance[7] providing suggestions to the State in response to its Draft EA.  All of Three Mountain Alliance's suggestions, however, were incorporated into the Final EA.  Additionally, the letter itself was attached as part of Appendix A to the Final EA.  The Final EA lists all of the individuals and organizations from whom it received comments during the public comment period.  The Final EA also included an appendix listing the comments it received on the Draft EA and the State's responses to the comments.

There is no support for Ohana Ho'opakele's argument that "the Final EA does not consider the issue of preservation of endangered and threatened plant and animal species," nor its argument that the State "essentially disregards comments from individuals, organizations and state and federal agencies regarding potential impacts on federally and state listed endangered flora and fauna at the [Kūlani CF] site."

Ohana Ho'opakele also argues that the effect of the proposed project on endangered species is sufficiently significant as to require an EIS.  Ohana Ho'opakele cites no evidence that supports such a conclusion.  The applicable standard that applies to "determining the necessity of an EIS based on the language of HRS § 343-5(c) . . . is whether the proposed action will 'likely' have a significant effect on the environment."  Kepo'o v. Kane, 106 Hawai'i 270, 289, 103 P.3d 939, 958 (2005).  Ohana Ho'opakele cites to a statement made by the Three Mountain Alliance concluding that the project "will likely affect several endangered and/or rare species in the area, not just found on [Kūlani CF] grounds but in the immediately adjacent forests of Pu'u Maka'ala and Kilauea."  In response, DPS stated, "While we are cognizant of the important resources surrounding the [Kūlani CF], we are not able to address mitigation of protective measures for the immediate area surrounding [Kūlani CF]."  Additionally, as previously noted, the Final EA

_____

[7] The Three Mountain Alliance states on its letterhead that its membership includes the DLNR, U.S. Geological Survey Biological Resources Division, Kamehameha Schools, U.S. Department of Agriculture Forest Service, Natural Resources Conservation Services, DPS, Hawai'i Volcanoes National Park, USFWS, and the Nature Conservancy of Hawai'i.

16

incorporated the concerns listed by the Three Mountain Alliance, and DPS included its responses to the Three Mountain Alliance in the appendix to the Final EA. Ohana Ho'opakele did not demonstrate that the information provided to the State established that the proposed action will likely have a significant effect on the environment.

We conclude that the section of the Final EA regarding the effect of the proposed action on endangered and threatened species "sets forth sufficient information to enable the decision-maker to consider fully the environmental factors involved and to make a reasoned decision" that the proposed action would not have a significant effect on endangered and threatened species. See Price, 81 Hawai'i at 183, 914 P.2d at 1376 (quoting Life of the Land, 59 Haw. at 164, 577 P.2d at 1121).

## IV. CONCLUSION

Therefore, the "Final Judgment in Favor of State Defendants and Against Plaintiffs" entered on November 14, 2014 in the Circuit Court of the Third Circuit is affirmed.

DATED: Honolulu, Hawai'i, January 12, 2016.

On the briefs:

James M. Dombroski
and
Georgette Yaindl
(Preventive Law Hawai'i)
for Plaintiffs-Appellants.

Diane Taira
Renee R. Sonobe Hong
Deputy Attorneys General
for Defendants-Appellees.

Chief Judge

Associate Judge

Associate Judge

17